IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 1:18-cv-2217

SHANE DERNICK,

    Plaintiff,

v.

COBRA KING INDUSTRY CO., LTD.,

    Defendant.

---

### Complaint and Jury Demand

---

Plaintiff, Shane Dernick ("Mr. Dernick"), by and through his attorneys, Dormer Harpring, LLC, for his Complaint and Jury Demand against Defendant Cobra King Industry Co., Ltd., ("Cobra King"), states as follows:

## GENERAL ALLEGATIONS

1. Mr. Dernick files suit under theories of products liability in connection with a degloving laceration and related injuries he received on August 29, 2016, from a truck fender, part number 39-9617-T, ("the Part") he ordered from Cobra King through Long Motor Corporation, d.b.a. LMC Truck ("LMC").

2. At the time he ordered, received, and was injured by the Part, Mr. Dernick's address was 4125 Fellsland Drive, Colorado Springs, Colorado 80922.

3. Mr. Dernick is not and has never been a professional car or truck mechanic or technician of any kind.

4. LMC was a Kansas for-profit corporation at the time it facilitated sale of the Part to Mr. Dernick and remains one now.

5. LMC's primary address was 14600 West 107th Street, Lenexa, Kansas 66215, at the time it facilitated sale of the Part to Mr. Dernick, and its address remains the same now.

6. LMC's registered agent is Registered Agent Kansas, Ltd., 10851 Mastin Boulevard, Suite 100, Overland Park, Kansas 66210.

7. Both before and at the time LMC facilitated sale of the Part to Mr. Dernick (in the paragraphs below, "that time"), LMC operated a business division it called "LMC Truck."

8. During that time and up until now, LMC has operated a website with an address of [www.lmctruck.com](www.lmctruck.com).

9. During that time and up until now, LMC's website has advertised to light pickup truck and sport utility vehicle "enthusiast[s]."

10. By "the enthusiast," LMC means the do-it-yourself amateur restorer or maintainer of his or her own light pickup truck or sport utility vehicle.

11. During that time and up until now, LMC's website has been search-engine-optimized to appear first in a Google.com search of "truck restoration parts" conducted from Colorado.

12. During that time and up until now, LMC's website has been search-engine-optimized to appear first in a Google.com search of "old truck parts" conducted from Colorado.

13. During that time and up until now, LMC's website has been search-engine-optimized to appear on the first page in a Google.com search of "truck parts" conducted from Colorado.

14. During that time and up until now, LMC's website has been intentionally search-engine-optimized to reach amateur truck restorers in Colorado.

15. During that time and up until now, LMC's website has encouraged online ordering from the entirety of the United States and Canada, including from Colorado.

16. During that time and up until now, LMC has intentionally dedicated itself to providing "the specific parts [amateur truck restorers] need in the shortest

time possible, delivered direct to [their] door[s]!" throughout the United States, including throughout Colorado.

17. During that time and up until now, LMC advertised multiple warranties and other promises to amateur truck restorers in Colorado regarding the parts it offered for sale.

18. During that time and up until now, LMC used stories from amateur truck restorers in Colorado who had bought parts from LMC to continue to advertise to amateur truck restorers in Colorado.

19. During that time and up until now, upon information and belief, Cobra King knew the facts listed above in Paragraphs 4 through 18.

20. During that time and up until now, upon information and belief, Cobra King sold the Part through LMC with knowledge of the facts listed above in Paragraphs 4 through 18.

21. During that time and up until now, Cobra King intentionally sought to sell products like the Part in "North America and World Wide."

22. During that time and up until now, Cobra King agreed to sell products like the Part through LMC with the intent that they would reach every state in the United States of America, including Colorado.

23. Prior to August 19, 2016, Mr. Dernick found LMC's web-based advertising from his home in Colorado.

24. On or around August 19, 2016, Mr. Dernick requested that LMC deliver the Part to his home in Colorado.

25. On or around August 19, 2016, LMC agreed to Mr. Dernick's request.

26. On or around August 19-22, 2016, LMC prepared and packaged the Part for shipment.

27. On or around August 22, 2016, LMC engaged UPS Freight to serve as its agent in delivering the Part to Mr. Dernick's door in Colorado.

28. On or around August 24, 2016, LMC completed delivery of the Part to Mr. Dernick's door in Colorado.

29. Upon information and belief, this Court has specific personal jurisdiction over Cobra King for purposes of this Complaint because it placed the Part into the stream of commerce with the expectation that it would be purchased in Colorado.

30. Under 28 U.S.C. § 1332, this Court has subject matter jurisdiction over this action because Mr. Dernick and Cobra King are not citizens of the same state and because the amount in controversy in this action exceeds $75,000.

31. Under 28 U.S.C. § 1391, venue is proper in the District of Colorado because a substantial part of the events giving rise to this action occurred in the District of Colorado.

32. On or before October 19, 2014, LMC began advertising steel body panels for light trucks and sport utility vehicles on its website.

33. LMC's steel body panel advertisements remained the same from October 19, 2014, through the time Mr. Dernick ordered the Part.

34. LMC's steel body panel advertisements promised, among other things, a "high precision die stamping process using high quality, heavy gauge steel."

35. Upon information and belief, LMC's promises as set forth in Paragraph 34 were the result of similar promises made to LMC by Cobra King.

36. By the time Cobra King produced the Part, Cobra King was manufactured its body panels as cheaply as possible.

37. Cobra King's address is No. 198-168 Sec. 2 Nan Shan N. Rd., Keng-Kou Village, Lu-Tsu Hsiang, Tao-Yuan Hsien, Taiwan R.O.C.

38. Upon information and belief, by the time LMC sourced the Part from Cobra King, Cobra King had been making products substantially identical to (meaning products intended for the same use on the same make and model of truck as) the Part that injured Mr. Dernick since the early-2000's.

39. Cobra King has been an exporter from Taiwan since the early-2000's.

40. Upon information and belief, LMC bought the Part from Cobra King as a part of a larger batch of substantially identical products.

41. When the Part was manufactured by Cobra King and shipped to LMC, some of its sheet metal edges were neither hemmed nor deburred.

42. Sheet metal is sharp when it is not hemmed or deburred.

43. At the time the Part was manufactured, it would not have been unreasonably expensive to deburr and hem its sheet metal edges.

44. When the Part was sent to LMC, it was not made of heavy gauge steel.

45. Sheet metal is sharper when it is made of a lighter gauge of steel because a lighter gauge of steel means the steel is thinner.

46. Because the Part's edges had not been hemmed or deburred or otherwise prepared and because the Part was not made of sufficiently-heavy-gauge steel, the Part contained numerous sharp edges.

47. There was no need to make the Part and those like it with any sharp edges.

48. Most sheet metal car parts that are intended for end-user consumers (like amateur truck restorers and maintainers) do not have similarly-sharp edges like those present on the Part.

49. Despite these sharp edges, Cobra King shipped the Part to LMC with the intent that they reach end-user consumers (amateur truck restorers and maintainers).

50. When LMC shipped the Part and those in its batch to end-user consumers, including Mr. Dernick, LMC packed them into large cardboard containers with packing material around the part.

51. These cardboard containers included no warning about the sharp edges present on the Cobra King fenders they contained.

52. This made the Part and those like it more likely to cut the end-user consumer.

53. These cardboard containers were designed to open from one of their narrow edges at the top of the container.

54. This made the Part and those like it more likely to cut the end-user consumer.

55. These cardboard containers were designed so that it was most logical for the end-user consumer to lift the fenders inside them up and out of the box.

56. This made the Part and those like it more likely to cut the end-user consumer.

57. These cardboard containers included no padding or other material intended to cover the sharp edges on the Part.

58. This made the Part and those like it more likely to cut the end-user consumer.

59. These cardboard containers made it difficult to see the edges of the fenders they contained.

60. This made the Part and those like it more likely to cut the end-user consumer.

61. Mr. Dernick received one of these cardboard containers with the Part inside it on or about August 24, 2018.

62. Around that time, Mr. Dernick was trying to help his step-son, Joel, restore a 1996 GMC Sierra they had bought a few weeks prior.

63. Just after work on or about August 29, 2016, Mr. Dernick and his step-son went to their garage to try to put the Part onto their truck.

64. Mr. Dernick opened the cardboard container with the Part inside and began to try to lift the Part out.

65. As Mr. Dernick was lifting the Part, he felt some of the Part's packaging materials catch on the inside of the cardboard container.

66. When those packaging materials caught, the Part shifted.

67. When the Part shifted, one of its sharp edges came to press on the skin of the palm side of his middle finger of his left hand, near the proximal portion of the intermediate phalanx.

68. As a result of that pressure, the Part cut into and along Mr. Dernick's finger, degloving most of the palm side of it.

69. As a direct and reasonably foreseeable result of this degloving cut, Mr. Dernick has suffered multiple injuries, damages, and losses (collectively, "Injuries").

70. The Injuries included, without limitation a permanent injury to the degloved finger itself; permanent injuries to the finger next to the degloved finger, the back of Mr. Dernick's arm, and the back of his lower leg as a result of attempted surgical reconstruction of the nerves and blood vessels of the degloved finger; balance issues as a result of the harvesting of nerves from his leg; post-traumatic stress disorder; and total inability to work due to post-traumatic stress disorder.

71. As a direct and reasonably foreseeable result of Mr. Dernick's Injuries, Mr. Dernick has suffered and will suffer economic damages, non-economic damages, and damages for permanent physical impairment and disfigurement.

72. As a direct and reasonably foreseeable result of the Injuries, Mr. Dernick has been rendered more vulnerable to subsequent injury.

73. Mr. Dernick's date of birth is October 26, 1972.

74. At the time he was injured by the Part, Mr. Dernick was a 43-year-old white male.

75. Under C.R.S. § 13-25-102, Mr. Dernick had a life expectancy of 35.4 additional years at the time he was injured by the Part.

## FIRST CLAIM FOR RELIEF

### (Negligence)

76. Mr. Dernick incorporates by reference ¶¶ 1-75 as though set forth in their entirety hereunder.

77. Cobra King owed Mr. Dernick a duty of reasonable care.

78. Cobra King breached its duty of reasonable care by, among other things, seeking profit over safety in sourcing the Part, failing to refrain from selling the Part after inspecting it, failing to educate LMC in how to safely package the Part for shipment, and failing to warn Mr. Dernick of the sharp edges on the Part.

79. Cobra King was negligent.

80. As a direct and reasonably foreseeable result of Cobra King's negligence, Mr. Dernick has suffered economic damages, non-economic damages, and damages for physical impairment and/or disfigurement.

## SECOND CLAIM FOR RELIEF

### (Strict Products Liability)

81. Mr. Dernick incorporates by reference ¶¶ 1-75 as though set forth in their entirety hereunder.

82. Cobra King designed, assembled, fabricated, produced, constructed, or otherwise prepared a product, within the meaning of C.R.S. § 13-21-401(1), to Mr. Dernick that consisted of the Part itself and the surrounding shipment packaging (together, this complete package was "the Product").

83. Cobra King was therefore a manufacturer of the Product sold to Mr. Dernick.

84. Cobra Kingwas engaged in the business of selling products like the Product for the use or consumption of people like Mr. Dernick.

85. Cobra King sold the Product.

86. The Product was defective and, because of the defect, the Product was unreasonably dangerous to people who might reasonably be expected to use, consume, or be affected by the Product.

87. The Product was defective at the time it was sold by Cobra King or left its control.

88. The Product was expected to reach Mr. Dernick without substantial change in the condition in which it was sold.

89. The Product did reach Mr. Dernick without substantial change in the condition in which it was sold.

90. Mr. Dernick was a person who would reasonably be expected to use, consume or be affected by the Product.

91. Mr. Dernick suffered and will suffer Injuries, including without limitation economic damages, non-economic damages, and physical impairment and disfigurement.

92. The defect in the Product was a cause of Mr. Dernick's Injuries, including without limitation economic damages, non-economic damages, and physical impairment and disfigurement.

## THIRD CLAIM FOR RELIEF
### (Manufacturer's Negligence)

93. Mr. Dernick incorporates by reference ¶¶ 1-75 as though set forth in their entirety hereunder.

94. Cobra King designed, assembled, fabricated, produced, constructed, or otherwise prepared a product, within the meaning of C.R.S. § 13-21-401(1), to Mr. Dernick that consisted of the Part itself and the surrounding shipment packaging (together, this complete package was "the Product").

95. Cobra King was therefore a manufacturer of the Product sold to Mr. Dernick.

96. Cobra King was negligent by failing to exercise reasonable care to prevent the Product from creating an unreasonable risk of harm to Mr. Dernick's person.

97. Mr. Dernick was one who might reasonably be expected to use the Product.

98. Mr. Dernick used the Product in the manner Cobra King might have reasonably expected.

99. Mr. Dernick has and will suffer Injuries, including without limitation economic damages, non-economic damages, and physical impairment and disfigurement that were caused by Cobra King's negligence while the Product was being used in a manner Cobra King should reasonably have expected.

## FOURTH CLAIM FOR RELIEF

**(Strict Product Liability for Misrepresentation of Fact)**

100. Mr. Dernick incorporates by reference ¶¶ 1-75 as though set forth in their entirety hereunder.

101. Cobra King sold the Product.

102. Cobra King was engaged in the business of selling the Product and those like it for resale, use or consumption.

103. Cobra King misrepresented a fact concerning the character or quality of the Product that would be material to potential purchasers or users of the product.

104. Specifically, among other things, Cobra King misrepresented the thickness of the steel used in manufacturing the Part.

105. This misrepresentation was made to potential purchasers or users as members of the public at large.

106. As a purchaser or user, Mr. Dernick reasonably relied on Cobra King's misrepresentation that the Part would be heavy gauge and high quality.

107. Mr. Dernick was a person who would reasonably be expected to use the Part.

108. Mr. Dernick has and will suffer Injuries, including without limitation economic damages, non-economic damages, and physical impairment and disfigurement caused by the reasonable reliance on the misrepresentation.

## FIFTH CLAIM FOR RELIEF

### (Breach of Express Warranty)

109. Mr. Dernick incorporates by reference ¶¶ 1-75 as though set forth in their entirety hereunder.

110. Cobra King sold the Product.

111. Cobra King expressly warranted that the Product would be made of heavy gauge steel.

112. Mr. Dernick was reasonably expected to use, consume, or be affected by the Product.

113. The Product was not as warranted.

114. This breach of warranty caused Mr. Dernick to suffer Injuries, including without limitation economic damages, non-economic damages, and physical impairment and disfigurement.

115. Within a reasonable amount of time after Mr. Dernick discovered this breach of warranty, he notified Cobra King of the breach.

## SIXTH CLAIM FOR RELIEF

### (Breach of Implied Warranty of Merchantability)

116. Mr. Dernick incorporates by reference ¶¶ 1-75 as though set forth in their entirety hereunder.

117. Cobra King sold the Product.

118. Mr. Dernick was reasonably expected to use, consume, or be affected by the Product.

119. Cobra King was a merchant with respect to products like the Part.

120. The Product was not of merchantable quality at the time it was sold to Mr. Dernick.

121. This breach of warranty caused Mr. Dernick to suffer Injuries, including without limitation economic damages, non-economic damages, and physical impairment and disfigurement.

122. Within a reasonable amount of time after Mr. Dernick discovered this breach of warranty, he notified Cobra King of the breach.

## **JURY DEMAND**

123. Mr. Dernick requests a trial by jury for all of his claims.

WHEREFORE, Plaintiff, Shane Dernick, requests that judgment be entered in his favor and against Defendant Cobra King Industry Co., Ltd., for all available relief, including without limitation economic damages, non-economic damages and damages for physical impairment and disfigurement, as well as and interest, costs, and attorney's fees, and such other relief as this Court deems proper.

RESPECTFULLY SUBMITTED at Denver, Colorado, this 28th day of August, 2018.

*s/ Sean M. Dormer*
Sean M. Dormer, Colo. Atty. Reg. 44962
K.C. Harpring, Colo. Atty. Reg. 47760
DORMER HARPRING, LLC
950 S. Cherry St., Ste. 300
Denver, CO  80246
Telephone: (303) 756-3812
Facsimile: (303) 477-7400
E-mail:   smd@denvertrial.com
          kch@denvertrial.com
*Attorneys for Plaintiff Shane Dernick*
